UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
STEPHEN P. WALSH,                                             Case No.:

                                  Plaintiff,

    - against -

SCARSDALE UNION FREE SCHOOL DISTRICT
AND MICHAEL MCDERMOTT,                                        **COMPLAINT**


                                  Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

       COMES NOW Plaintiff Stephen P. Walsh ("Plaintiff" or "Mr. Walsh"), by and through his undersigned counsel, The Law Offices of Neal Brickman P.C., 420 Lexington Avenue, Suite 2440, New York, New York 10170, as and for his Complaint against Defendants Scarsdale Union Free School District ("SUFSD") and Michael McDermott ("Mr. McDermott") (referred to collectively herein as "Defendants"), alleges, upon knowledge as to his own conduct, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

       1.    This action arises under the Age Discrimination in Employment Act ("ADEA") 29 U.S.C. § 621 *et seq.*; and the New York State Human Rights Law ("NYSHRL") § 290 *et seq.* Plaintiff alleges that Defendants discriminated against him because of his age and that the discrimination against him culminated in his constructive discharge. Mr. Walsh was sixty-three (63) years old at the time of his constructive discharge.

       2.    Plaintiff seeks compensatory and punitive damages and other relief arising from Defendants' illegal, discriminatory, and disparate treatment of Plaintiff, as a result of his age, under Federal and New York State anti-discrimination laws.

1

## PARTIES

3.     Plaintiff Stephen P. Walsh is, and was at all times relevant hereto, an individual citizen of the United States, residing in South Salem, New York.

4.     Defendant Scarsdale Union Free School District is a school district located in Scarsdale, New York. SUFSD has a principal place of business at 2 Brewster Road, Scarsdale, New York 10583.

5.     Defendant Michael McDermott is, and was at all times relevant hereto, an individual citizen of the United States. Mr. McDermott is, and was at all times relevant hereto, employed by the SUFSD in Scarsdale, New York. On information and belief, Mr. McDermott resides in Putnam County, New York.

## JURISDICTION AND VENUE

6.     Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1391 because the principal place of business of the Defendant SUFSD is in this district, and, on information and belief, Defendant Michael McDermott resides in this district, and the causes of actions alleged herein occurred in this district.

7.     This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331 in that the claims herein arise under the laws of the United States. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over related claims brought under the New York State Human Rights Law.

8.     Mr. Walsh filed an EEOC charge on March 31, 2015. This charge was filed within 300 days of the last discriminatory act perpetrated by SUFSD and Mr. McDermott. Mr. Walsh served a Verified Notice of Claim upon the SUFSD and Mr. McDermott on May 21, 2015. This action is commenced within one year and ninety (90) days of that Notice. On

February 17, 2016, the EEOC mailed a "right to sue" letter to Mr. Walsh. This action is commenced within ninety (90) days of Plaintiff's receipt of that letter.

## FACTUAL BACKGROUND

9. This is an action for compensatory and punitive damages stemming from the Defendants' discriminatory treatment of Mr. Walsh, culminating in his constructive discharge, all because of his age, in contravention of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et, seq.; and the New York State Human Rights Law ("NYSHRL") § 290 *et seq.*

10. Mr. Walsh was hired as a middle school mathematics teacher in the SUFSD in 1995.

11. Mr. Walsh was granted tenure, when he was first eligible, in 1998.

12. For his first fifteen (15) years as a teacher, Mr. Walsh had an unblemished record and he routinely received praise for his teaching, camaraderie, manner with his students, and relationships and interactions with parents.

13. Mr. Walsh's ouster was part of a larger pattern utilized by the SUFSD to force out older, more highly compensated teachers, so that the SUFSD could replace them with younger, lower-salaried teachers.[1] This technique was cloaked under the guise of performance issues; however, it was motivated by one thing -- removing older teachers to save money.

---

[1] A number of "older" teachers were subjected to "heightened" scrutiny for the sole purpose of attempting to manage them out of the district. This technique was used on Irving Sloan, Mike Katz, Harvey Flisser, and Caren Pullen. By way of example only, Ms. Pullen, a teacher who was on staff at the time of Mr. Walsh's ouster, was told by Mr. McDermott that he would "back off" from her frequent observations if she would announce her retirement. Ms. Pullen immediately reported this inappropriate behavior to Dr. Weber, the Assistant Superintendent for Personnel. Unfortunately, Dr. Weber did nothing to curb or stop the utilization of this management technique to coerce Mr. Walsh's early, forced resignation. On information and belief, the SUFSD and Mr. McDermott stopped their harassment of Ms. Pullen solely due to the fact that Mr. Walsh filed a charge with the EEOC as a result of their unjustified campaign of harassment against him due to his age.

14. As Mr. Walsh began to advance in age, the SUFSD and Mr. McDermott became determined to find a way to remove him, despite his stellar career as a mathematics teacher. The SUFSD and Mr. McDermott were ready to seize on any type of perceived issue so that they could build a "record" to justify the planned ouster of Mr. Walsh.

15. At or about the end of the 2010 school year, the SUFSD and Mr. McDermott finally saw the very opportunity they sought to justify Mr. Walsh's planned ouster.[2]

16. Nevertheless, as a result of a single "incident" that occurred on May 11, 2010, without any warning, or actual justification, Mr. Walsh received an "unsatisfactory" rating at the end of the 2010 school year, despite the fact that no one had indicated to him any concerns with his conduct or teaching. Mr. Walsh had *never* before received an unsatisfactory rating at any point in his entire teaching career.

17. This "incident" involved Mr. Walsh asking, and receiving permission from, two colleagues to interrupt their classes to "call out" several students who had falsely "blamed" Mr. Walsh for keeping them late to complete a math test. The students used this fabricated excuse to justify their tardiness in getting to their next class. Prior to this specific "incident," several students, on numerous occasions, arrived late to their classes that followed Mr. Walsh's math class. These students, again, on numerous occasions, told their teachers that the reason that they were tardy was because Mr. Walsh kept them late. In each instance, the students' claims were false.

18. After receiving permission from the two other teachers, Mr. Walsh addressed two separate classes of students. He asked any of the students that had been late coming from his class to stand up if the reason that they were tardy to their next class was because he kept them

---

[2] Prior to this time period, Mr. Walsh had never been advised of any alleged concerns or complaints, by a student or a parent, related to his teaching or classroom conduct. He had an unblemished record of satisfactory reviews and performance ratings. He was granted tenure, when first eligible, without a hint of concern or question.

4

late. No students stood up. Mr. Walsh neither raised his voice, nor cursed. Mr. Walsh was simply trying to hold students accountable for their actions (i.e., they cannot tell teachers that they were late to class because they were kept late by another teacher when it was patently false). When Mr. Walsh addressed each of the two classes his voice was only slightly louder than a conversational tone due to the fact that he was addressing an entire class of students.

19. In a clear and utter overreaction, purportedly based on this single incident, Mr. McDermott placed Mr. Walsh on "full review" for the following year, and made a mandatory Supervisory Referral to Dr. Irma Van Dam, the Employee Assistance Psychologist. Mr. McDermott further advised Mr. Walsh that he would be observed both formally and informally over the course of the next year with an administrator observing at least one of his classes daily. These punitive actions were unwarranted and implemented only as a pretext for attempting to "manage" Mr. Walsh out. None of these actions was designed to improve Mr. Walsh's performance, or to insulate students from any inappropriate behavior whatsoever. In fact, Mr. Walsh was not actually given any feedback and he never received the daily supervision with which he had been threatened.

20. Mr. Walsh met with Dr. Van Dam who advised him that there was nothing "wrong" with him, that he did not need counseling, and he should continue to do what he had for fifteen (15) years. Notwithstanding this advice, and presumably at the behest of the principal, *Dr. Van Dam suggested numerous times that he should "consider" retirement.*

21. The classroom observations of Mr. Walsh proceeded sporadically for about a month and then ended abruptly. Mr. Walsh neither received any feedback at all, nor was he counseled or advised regarding any deficiencies. This is telling because if the full review was for any legitimate, and non-discriminatory purpose, the SUFSD and Mr. McDermott would have

5

surely followed up with Mr. Walsh and made sure that the allegedly "inappropriate" behavior that had led to his "unsatisfactory" rating was corrected. The simple truth is that the SUFSD and Mr. McDermott were determined to stop at nothing until they could force Mr. Walsh into early retirement, or if need be, fire him. Upon seeing that they could not use this "incident" as justification to remove Mr. Walsh, they had no choice but to end their unwarranted review of him. Both the SUFSD and Mr. McDermott were well aware that the "unsatisfactory" rating that Mr. Walsh received was completely illegitimate.

22. The next four years proceeded completely without incident. For each of the following years, including the year in which the alleged incident occurred, Mr. Walsh received "satisfactory" ratings. However, the next push to force Mr. Walsh into early retirement came as he approached his twentieth year, when the SUFSD -- and once again instigated by the principal, Mr. McDermott -- seized on a single, minor "incident" to ratchet up the pressure on Mr. Walsh to retire. The SUFSD and Mr. McDermott knew that Mr. Walsh was closing in on achieving his full retirement benefits and were determined to remove Mr. Walsh before he could realize his intended years of service.

23. Mr. Walsh's military service entitled him to an additional three years' service credit for the purposes of calculating his retirement benefits. Therefore, he planned to retire after twenty-one (21) years, thereby increasing his entitlements to twenty-four (24) years' total service. This would not only maximize Mr. Walsh's retirement benefits, but would coincide with the date of his wife's planned retirement.

24. Mr. Walsh made it clear for years, to both his colleagues and supervisors, that both he, and his wife -- who was a teacher in a nearby school district -- planned to retire at the end of the 2015-2016 school year.[3]

25. All of Mr. Walsh's retirement documents, including social security benefits analysis, and the NYS Teacher's Retirement Fund indicated his planned retirement as the end of the 2015-16 school year. The SUFSD and Mr. McDermott were aware of Mr. Walsh's planned retirement date. However, Defendants were determined to stop at nothing to force Mr. Walsh into retirement prior to his planned retirement date.

26. The second "incident" occurred on May 1, 2014, when Mr. Walsh was monitoring a New York State Math Assessment. As a math teacher, Mr. Walsh had spent several weeks preparing middle school students for the state exam. Mr. Walsh and other SUFSD staff members were proctors for the exam.

27. Approximately forty (40) minutes into the ninety (90) minute exam, the students in Mr. Walsh's classroom began to look up because of a tremendous amount of noise coming from the classroom next door. The amount of noise was so great that it was clear that the students in that classroom were no longer taking the exam, despite the fact that the exam instructions made it clear that all students must remain silent, and in their seats, for the entirety of the exam.

28. Mr. Walsh promptly called the house counselor's office, the office of the department chair, and the office of the assistant principal. None of these calls were answered. At this time, Mr. Walsh requested that a hall monitor come in to proctor the exam in his place so that he could see what the commotion was in the classroom next door. When Mr. Walsh arrived

---

[3] For example, in May of 2014, while attending a teacher course in Boston, Massachusetts, Mr. Walsh advised his department chair, Cindy Parrot, and another former department chair, Len Tellevi, that he planned to retire at the end of the 2015-16 school year.

in the classroom next door, he found students sitting on desks, walking around, and talking at an incredibly loud volume. Most shockingly, he noticed that the proctor, Steve Goodman ("Mr. Goodman"), a younger teacher in the department, had given all of the Scantron test sheets to a *student* -- totally unsupervised -- so that the student could alphabetize the exams!

29. Mr. Walsh advised Mr. Goodman that the students were required to sit for the entire ninety (90) minutes. He told him that he was violating protocol in a variety of ways. Mr. Goodman said that it was "no big deal." Mr. Walsh told Mr. Goodman that he needed to retrieve the test papers from the student, that the students needed to remain in their seats until the end of the ninety (90) minutes, and that the students were disrupting the students in the nearby classrooms.

30. On the way back to his classroom, Mr. Walsh noticed that the same thing was going on in the other adjoining classroom next door. Mr. Walsh told the students in that classroom that they needed to remain in their seats until the end of the exam and advised the proctor of the same.

31. Mr. Walsh attempted to stop a noise disturbance and numerous breaches of testing protocol, in order to protect the integrity of the testing results and to allow the students that he was proctoring to complete the test without disruption.[4] Despite the fact that Mr. Walsh was right to attempt to quell the disturbance and protect the integrity of the test, and that others had breached the testing protocol, Mr. McDermott seized upon this "incident" to again ratchet up the pressure on Mr. Walsh to resign.

32. Mr. Walsh was accused wrongfully of audibly using foul language in commenting to an unidentified colleague about the mismanagement of testing procedures and the potential

---

[4] Mr. Walsh spent weeks preparing his students for this exam. His concern over the integrity of the exam results speaks to Mr. Walsh's dedication to his profession and his sincere belief in academic integrity.

disqualification of the state exam results. Mr. Walsh was contacted by Mr. McDermott and was instructed to be in his office on a certain date with his union representative.

33. Seizing solely upon this alleged incident, Mr. McDermott rated Mr. Walsh as "unsatisfactory" in his Professional Performance Review for the 2013-14 school year. In addition to this proctoring incident, Mr. McDermott premised the "unsatisfactory rating" on four (4) additional alleged deficiencies, three of them completely invented, and of which Mr. Walsh had never been advised, warned or counseled about; (1) his lateness (of less than ten (10) minutes) to school on two (2) dates (discussed); (2) unspecified reports of inappropriate interaction with students in other colleagues' classes (invented); (3) unspecified improper interactions with his students (invented); and (4) communication about students to parents (invented). [5]

34. Again, Mr. Walsh was referred to Dr. Irma Van Dam and put on "full review," and again, further counseling was determined to be unwarranted. However, Dr. Van Dam requested that Mr. Walsh check in with her again during the first few months of the new term, and once again, presumably at the behest of Mr. McDermott, urged Mr. Walsh to strongly consider retiring earlier than he had planned.

35. Mr. Walsh was advised that one of his supervisors would observe one of his classes each day to ensure that his interactions with students and colleagues were "professional and appropriate." This time the Defendants were even more intent on finding a way to force Mr. Walsh out. No younger teachers -- specifically those who blatantly violated the testing protocol in a complete and utter dereliction of their obligations as educators -- were disciplined at all. This

---

[5] The vague deficiencies and complaints that were allegedly received by the SUFSD and Mr. McDermott about Mr. Walsh were never brought to his attention which calls into question their very existence. Over the years, Mr. Walsh has received countless emails from parents praising his work with their children and thanking him. Any of these alleged complaints are irrelevant in any event, as this case centers around the improper and calculated harassment of Mr. Walsh, due to his age, for the purpose of forcing him into early retirement so that he could be replaced with a younger, lower-salaried teacher, and so that he would not receive his intended retirement benefits.

9

is incredibly telling as the teachers who violated the testing protocol jeopardized the results of the test, and more generally, the academic integrity of the school.

36. The Defendants' objective was not to help Mr. Walsh change any behavior, but to accelerate the pressure on him so that he would retire early.

37. In the first four months of the 2014-15 school year, Mr. Walsh was observed an *unprecedented* thirty-one (31) times and an additional twenty (20) times thereafter. Only two of those were formal reviews and both resulted in "Satisfactory" rating -- the highest available. Of the twenty-nine (29) unannounced informal full period observations, conducted by any of four administrators, including Mr. McDermott, two assistant principals, and the other department chair, Mr. Walsh received absolutely no feedback or advice on how to improve his performance or alter his behavior, all of which belie the genuineness of this second "full" review. The simple truth is that there was nothing wrong with Mr. Walsh or his behavior, and both the SUFSD and Mr. McDermott were well aware of the frivolous nature of the "unsatisfactory" rating that Mr. Walsh had received.

38. Several of Mr. Walsh's colleagues commented to him that the level of observation and scrutiny that he was placed under by the SUFSD and Mr. McDermott was absolutely unheard of and completely without justification. Furthermore, a more formal and structured review process formerly instituted and previously applied which emphasized continuity in each observation by having the same administrator observe a given class on multiple and subsequent days for continuity, providing weekly review and feedback, and assigning a mentor for ongoing counsel and support, were all abandoned in this instance even though the author of this process was in fact the science department chair, Jennifer Gilbert ("Ms. Gilbert"). Ms. Gilbert was a member of Mr. Walsh's teaching team at the time.

39. This near daily supervision was detrimental to Mr. Walsh's ability to do his job effectively. This relentless, unannounced supervision was disruptive to Mr. Walsh's class and placed a burdensome amount of pressure on him. It humiliated him in front of his students and eroded his respect and standing with both his students and colleagues. It made his students and colleagues believe that he had done something horribly wrong and that he was not to be trusted.

40. The Defendants were not interested in Mr. Walsh's professional development or his behavior. Rather, their sole motive was to coerce his early retirement and, if unsuccessful, the SUFSD needed a "record" to justify the termination of his employment in order to replace him with a younger, less expensive, teacher.

41. The Defendants ultimately succeeded in forcing Mr. Walsh to retire with their last unfounded campaign of harassment. On January 15, 2015, Mr. Walsh submitted -- under protest and with full reservation of his rights -- his early retirement notice, effective in June of 2015 at the close of the 2015-16 school year, in order not to forfeit a $10,000.00 retirement bonus which was provided for in the applicable teacher contract for that time period.

42. The constant harassment for no apparent reason, other than Mr. Walsh's age, and transparent attempt to "catch him" in any indiscretion was not only affecting his health (required for the first time in his life to take prescription medicine for an aggravated ulcer), but also created an environment that completely undermined Mr. Walsh with his students and made it impossible for him to perform at the stellar level at which he had performed for nearly two (2) decades.

43. Mr. Walsh did not voluntarily retire, he was constructively discharged, because of his age and seniority. At the time of his constructive discharge, Mr. Walsh had been a dedicated,

tenured math teacher at the Scarsdale Middle School for almost 20 years with an unblemished record but for the two minor incidents, which had been fabricated.

44. The SUDSD and Mr. McDermott stopped at nothing in order to remove Mr. Walsh's salary from the school's budget and to prevent Mr. Walsh from receiving his intended retirement benefits. The relentless, concerted, and unjustified campaign of harassment by the SUFSD and school principal, Mr. McDermott, aimed at forcing Mr. Walsh into early retirement was in clear violation of the ADEA and NYSHRL.

45. As a result of this illegal and discriminatory campaign, Mr. Walsh has suffered great financial harm and has suffered, and continues to suffer, severe emotional distress.

### FIRST CLAIM
**(Discrimination in contravention of the Age Discrimination in Employment Act)**
**(against SUFSD and McDermott)**

46. Plaintiff repeats and realleges the allegations set forth in paragraphs "1" through "45" of this Complaint as if set forth fully herein.

47. The ADEA prohibits discrimination and disparate treatment by employers on the basis of age.

48. Plaintiff, an individual, was the object of discrimination by Defendants because he was constructively discharged, wrongfully and unlawfully, because of his age, sixty-three (63) years old.

49. Despite the fact that Plaintiff had received positive performance reviews over the course of his twenty-year career as a teacher in the SUFSD, and that Plaintiff met and exceeded each and every expectation that was set for him, Defendants led a concerted campaign to constructively discharge Plaintiff because of his age. Defendants did this for the sole purpose of denying Plaintiff the ability to realize his maximum retirement benefits and so that they could replace Plaintiff with a younger teacher who would be paid a fraction of Plaintiff's salary.

50.     Defendants discriminated against Plaintiff in the terms and conditions of his employment on the basis of his age, in violation of the ADEA 29 U.S.C. § 621 *et seq.,* which led to the wrongful and illegal, constructive discharge of Plaintiff.

51.     Defendants knew their conduct was prohibited by the ADEA and/or showed reckless disregard for whether it was prohibited. Defendants' unlawful actions by, among other things, engaging in this discriminatory behavior, has not only caused Plaintiff severe emotional distress, but has severely harmed Plaintiff financially.

52.     As a direct and proximate result of Defendants' unlawful, discriminatory conduct in violation of the ADEA, Plaintiff was constructively discharged and Plaintiff has suffered, and continues to suffer, emotional distress and has suffered financially due to the loss of a full year of salary and a reduction in his retirement benefits. Plaintiff is, therefore, entitled to an award of monetary damages and other relief.

WHEREFORE, Plaintiff respectfully demands judgment against Defendants in an amount to be determined at trial, but in no event less than $1,500,000.00 for compensatory and punitive damages. Plaintiff is also entitled to prejudgment interest, attorneys' fees and costs in an amount to be determined at trial.

### SECOND CLAIM
**(Discrimination in contravention of the New York State Human Rights Law § 290 *et seq.*)**
**(against SUFSD and McDermott)**

53.     Plaintiff repeats and realleges the allegations set forth in paragraphs "1" through "52" of this Complaint as if fully set forth herein.

54.     The NYSHRL prohibits discrimination and disparate treatment by employers on the basis of age.

55. Plaintiff, an individual, was the object of discrimination by Defendants because he was constructively discharged, wrongfully and unlawfully, because of his age, sixty-three (63) years old.

56. Despite the fact that Plaintiff had received positive performance reviews over the course of his twenty-year career as a teacher in the SUFSD, and that Plaintiff met and exceeded each and every expectation that was set for him, Defendants led a concerted campaign to constructively discharge Plaintiff because of his age. Defendants did this for the sole purpose of denying Plaintiff the ability to realize his maximum retirement benefits and so that they could replace Plaintiff with a younger teacher who would be paid a fraction of Plaintiff's salary.

57. Defendants discriminated against Plaintiff in the terms and conditions of his employment on the basis of his age, in violation of the NYSHRL, which led to the wrongful and illegal, constructive discharge of Plaintiff.

58. Defendants knew their conduct was prohibited by the NYSHRL and/or showed reckless disregard for whether it was prohibited. Defendants' unlawful actions by, among other things, engaging in this discriminatory behavior, has not only caused Plaintiff severe emotional distress, but has severely harmed Plaintiff financially.

59. As a direct and proximate result of Defendants' unlawful, discriminatory conduct in violation of the NYSHRL, Plaintiff was constructively discharged and Plaintiff has suffered, and continues to suffer, emotional distress and has suffered financially due to the loss of a full year of salary and a reduction in his retirement benefits. Plaintiff is, therefore, entitled to an award of monetary damages and other relief.

WHEREFORE, Plaintiff respectfully demands judgment against Defendants in an amount to be determined at trial, but in no event less than $1,500,000.00 for compensatory and

punitive damages. Plaintiff is also entitled to prejudgment interest, attorneys' fees and costs in an amount to be determined at trial.

## RELIEF REQUESTED

Based upon the foregoing, Plaintiff requests the Court award Plaintiff as follows:

(A)  As to Plaintiff's First Claim: compensatory and punitive damages in an amount to be determined at trial, but in no event less than $1,500,000.00, plus applicable interest, reasonable costs, and attorneys' fees;

(B)  As to Plaintiff's Second Claim: compensatory and punitive damages in an amount to be determined at trial, but in no event less than $1,500,000.00, plus applicable interest, reasonable costs, and attorneys' fees;

(C)  Such other and further relief as this court deems just and proper.

## JURY DEMAND

Plaintiff respectfully requests that this matter be tried before a jury.

Dated:  New York, New York
        May ___, 2016

THE LAW OFFICES OF NEAL
BRICKMAN, P.C.

_/s/ Virginia A. Reilly_
Virginia A. Reilly, Esq. (VR 8019)
Neal Brickman, Esq. (NB 0874)
420 Lexington Avenue, Suite 2440
New York, NY 10017
(212) 986-6840
neal@brickmanlaw.com
*Attorneys for Plaintiff Stephen P. Walsh*