UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

STEPHEN P. WALSH,

                         Plaintiff,

    -against-

SCARSDALE UNION FREE SCHOOL DISTRICT,
and MICHAEL McDERMOTT

                      Defendants.

No. 16 Civ. 3558 (NSR)

**OPINION & ORDER**

---

NELSON S. ROMÁN, United States District Judge

Plaintiff Stephen P. Walsh ("Plaintiff" or "Walsh") commenced this action against his former employer, the Scarsdale Union Free School District ("Scarsdale" or "SUFD") and Michael McDermott ("McDermott") (collectively, "Defendants") on May 12, 2016. (*See* Complaint, ("Compl."), ECF No. 1.) Plaintiff alleges that Defendants discriminated against him because of his age and that the discrimination against him culminated in his constructive discharge. The action arises under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* and New York State Human Rights Law ("NYSHRL") § 290 *et seq.* Plaintiff seeks compensatory and punitive damages and other relief, permitted under Federal and New York State anti-discrimination laws, arising from Defendants' illegal, discriminatory, and disparate treatment of Plaintiff.

Before the Court is the Defendants' Motion for Summary Judgment on Plaintiff's age-based discrimination and constructive discharge claims. (*See* Defendants' Motion, ECF No. 30.) For the following reasons, Defendants' Motion is DENIED in its entirety.



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/22/2019

1

# BACKGROUND[1]

### I.     Parties

Plaintiff, Stephen P. Walsh, is a retired middle school mathematics teacher who was born in 1951 and who was first employed by Scarsdale Middle School on September 1, 1995. When he was hired, he was forty-four years old. He was awarded tenure in 1998, when he was forty-seven years old. He worked for 19 years at Scarsdale Middle School. Plaintiff intended to retire from his position at the end of the 2015-2016 school year, after his twentieth year of teaching. Instead, Plaintiff resigned from his position as a mathematics teacher by a letter dated January 13, 2015, less than a year before his planned retirement. He was 67-years old at the time.

Michael McDermott was the middle school principal during the time relevant to this lawsuit. He was part of the committee that hired Plaintiff, and he had recommended that Plaintiff be hired and awarded tenure. Further, McDermott was born in 1950 and was sixty-three to sixty-five years old in 2014-2015. McDermott is approximately one year older than Plaintiff.

### II.     Plaintiff's Employment History

For the first 15 years that he taught at Scarsdale, Plaintiff claims that he was never advised of any concerns or complaints by any student or parent, related to his teaching or classroom conduct. Then, towards the end of the 2010 school year, he claims that he was subject to disproportionate punishments for two minor incidents that occurred in May of 2010 and 2014, respectively. (Plaintiff's Opposition to Summary Judgment, ("Pl. Opp.") at 2, ECF No. 36.)

---

[1] The facts are drawn from the Defendants' Rule 56.1 Statement of Undisputed Material Facts ("Def. 56.1") (ECF No. 33) and Plaintiff's Rule 56.1 Statement of Undisputed Material Facts ("Pl. 56.1.") (ECF No. 42) and the exhibits attached to each. They are undisputed except where indicated.

### III.     First Incident (May 11, 2010)

The first incident, which occurred in May 2011, involved another teacher, Alex Campbell, who had previously granted Plaintiff permission to come into her classroom and discuss the issue of students being tardy to her class and blaming it on Mr. Walsh keeping them late. (Pl. 56.1 ¶ 39, ECF No. 42.) On May 11, 2010, Plaintiff went down to Ms. Campbell's class and addressed the students about the issues of their being late and lying. (*Id.*) When Plaintiff finished addressing Ms. Campbell's class, he claims that she suggested that he go next door to the classroom of another teacher, Cara Forray, and do the same thing. So, he did. According to Defendants, on these occasions, Plaintiff spoke to the students in more than just a disciplinary tone—he was "belligerent and caustic" and frightened students and the teachers with a "complete and total tirade." (*Id.* ¶ 41.) Plaintiff disagrees. He admits that his tone was disciplinary, but is adamant that it was never "belligerent," "caustic," nor a "tirade." (*Id.* ¶ 39.)

The parties dispute the extent to which Ms. Campbell and Ms. Forray were distressed by the encounter. The two of them did write a memorandum about the incident, and subsequently, on May 17, 2010, Plaintiff and McDermott had a meeting about it. McDermott then made a referral for Plaintiff to the District's Employee Assistance Program ("EAP.") This referral required that Plaintiff attend a meeting with the EAP Coordinator, Dr. Irma Van Dam.

According to Plaintiff, when he met with Dr. Van Dam, she advised him that there was nothing "wrong" with him, that he did not need counseling, and that he should continue to do what he had done for 15 years. (Pl. Opp. at 3.) But, according to Plaintiff, she also suggested – numerous times – that he should "consider" retirement. (*Id.*)

In addition, McDermott placed Plaintiff on "full review" status. As part of being on "full review," McDermott told Plaintiff that he would be formally and informally observed over the

course of the next year, with an administrator observing at least one of his classes daily. This was the first time that Plaintiff was placed on "full review" status. McDermott then memorialized the meeting, from his perspective, in a letter/memorandum, dated May 20, 2010. (*See* May 20, 2010 Letter, Exhibit E, ECF No. 31.) Plaintiff vehemently disputes the truth of the statements in the letter, including McDermott's characterizations of Plaintiff.

According to Plaintiff, the formal and informal observations proceeded sporadically for about one month and then ended abruptly without Plaintiff receiving any feedback, counseling, or advice regarding deficiencies. (*Id.*) But at the end of the school year, in May 2010, Plaintiff received, for the first time in his teaching career, an "unsatisfactory" performance review. (*See* Professional Performance Review, Ex. 15, ECF No. 35.)

## IV. Second Incident (May 1, 2014)

The second incident occurred on May 1, 2014. That day, Plaintiff was proctoring a New York State Math Assessment. While proctoring the test, about half-an-hour before it was supposed to end, Plaintiff claims that he began to hear loud noises coming from outside his classroom. Plaintiff claims that, after calling the chairperson of the mathematics department and receiving no reply or help, he left his classroom to investigate the noise's source, which he learned was from the classroom next door. There, Plaintiff saw chaos in a room where an exam was supposedly being proctored by Steven Goodman. Plaintiff describes witnessing a scene where "the source of the noisy disturbance [was] students up out of their seats, talking loudly, playing chess and handling the scantrons for the exams, which … [was] disturb[ing] his students and violated the testing protocol." (Pl. 56.1 ¶ 52.) Plaintiff claims that, in response to witnessing this unexpected conduct, he raised his voice to ask the students to sit down and be quiet. (*Id.*)

Defendants disagree about exactly how the classroom encounter went. They contend that

Plaintiff was disproportionately angry and used a loud voice, yelling in the classroom and hallway, and shouting obscenities. (Pl. 56.1 ¶¶ 54-55.) Plaintiff states that no one saw him entering or exiting the classroom, and that he does not recall whether he used an obscenity after he left, but knows that no one else was present and close enough to him to have accurate personal knowledge.

Plaintiff subsequently met with McDermott about this issue on May 5, 2014. During this meeting, McDermott mentioned the mathematics exam incident and also discussed other performance issues, such as Plaintiff's purported lateness and certain alleged parental complaints. McDermott also raised an incident in which Plaintiff had "interjected himself into Jeanne-Marie Castiello's class when an outside instructor from Lincoln Center was present." Plaintiff does not dispute that McDermott raised this incident, but disputes the characterization of it, noting that Ms. Castiello found nothing disruptive about his going into her class and told this to McDermott. Plaintiff adds that Ms. Castiello refused McDermott's request to document this alleged incident. Plaintiff and Defendants similarly dispute the relevance and egregiousness of several other purported "incidents" that McDermott raised during this meeting.

McDermott characterized Plaintiff's attitude as "dismissive" and wrote that Plaintiff attempted to "explain away, minimize or blame others" for his behavior. McDermott also stated that Plaintiff's conduct "represents a pattern of behavior" that had been previously reported and discussed. Plaintiff disagreed and felt that his behavior was being purposefully manipulated and overblown. Plaintiff raised these concerns with his Union, (Walsh Dep. at 71-73, Ex. 2, ECF No. 35), and with Dr. Weber, (Weber Dep. at 125, Ex. 3, ECF No. 35), but to no avail. McDermott then, again, referred Plaintiff to Dr. Van Dam.

In addition to meeting with Dr. Van Dam at the EAP, Plaintiff was told he would be required to sign in on a daily basis and either McDermott or Assistant Principal Rochelle Hauge

would be required to preview any written communications about students before any meetings. In addition, McDermott changed Plaintiff's house assignment and again placed Plaintiff on "full review" for the 2014/2015 school year. Plaintiff was told about the decision to place him on "full review" during a meeting on May 5, 2014, attended by: McDermott, the Assistant Principal Rochelle Hauge, Mathematics Department Chair Cindy Parrott, and Scarsdale Teachers Association Union Representative Laurie Ciccone.

Plaintiff was then given a letter/counseling memorandum summarizing the meeting and indicating that he would be put on full review for the following year on May 14, 2014. The letter advised Plaintiff that the full review would consist of one of his supervisors observing one of Plaintiff's classes each day to ensure that his interactions with staff were professional and appropriate. (May 14, 2014, Counseling Memorandum, Ex. G, ECF No. 31.) According to Plaintiff, between September 1, 2014 and January 1, 2015, he had 31 classroom observations, a nearly unprecedented number for any faculty member. The observations were of one forty-five class period each day. According to Plaintiff, this number of informal observations, in conjunction with the length of those observations and the lack of feedback he received, was also unprecedented.

The parties dispute the purpose of the copious classroom observations. According to Defendants, it was to ensure that Plaintiff's interactions with students and staff were professional and appropriate. According to Plaintiff, there was no good reason for the multitude of observations. Rather, Plaintiff believes that the real purpose was to undermine his authority, humiliate him, and force him to leave. Neither party disputes that the supervisors who conducted the classroom observations did not say anything to Plaintiff during or after the observations. Similarly, neither party disputes that Plaintiff continued to receive his full pay and benefits whilst he was being observed. The parties do dispute whether and to what extent Plaintiff suffered repercussions,

emotionally and financially, from being observed. They also dispute whether and to what extent Plaintiff was subjected to derogatory comments during this period.

Plaintiff never filed a grievance, pursuant to the procedure set out in his Collective Bargaining Agreement ("CBA"). The CBA had been executed between the Scarsdale Teacher's Association and SUFD and was effective July 1, 2013 through June 30, 2016. (*See* Exhibit Y, CBA, ECF No. 31.) It contained a grievance procedure and a procedure for professional performance reviews, pursuant to Article 35, Section F.

It also contained a provision on the full review process:

> **Informal Classroom Visits and Conferences** – Nothing in this Article shall be deemed to prohibit conference with the teacher or informal classroom visits which may be made apart from formal observations. Any material to be placed in a teacher's file as a result of such conferences or informal visits shall be placed there in accordance with Article 26 of this Agreement.

Further, CBA Article 36, entitled "Professional Standards," permits a supervisor to "review the performance of a teacher at any time." The CBA also provides that teachers are to be paid based on a step system related to a teacher's seniority and academic background. It also provides for an early notification of retirement stipend payment. This incentive provides a $10,000 stipend payment to any teacher who submits notice to the District Assistant Superintendent for Personnel of their Retirement by January 15th of any year.

According to Plaintiff, the reason that he did not file a grievance was because when he went to the Union President, David Wixted, Wixted told him that they would not support his grievance and that "he should just put his head down and bear whatever was going to come his way." (Pl. 56.1 ¶ 81.) Plaintiff was also allegedly told that they had never filed a grievance related to the Middle School before. Plaintiff notes that, at the time, Wixted's wife was being considered by McDermott for a house counselor job, which she could not get without McDermott's support.

## V. Plaintiff's Voluntary Resignation and Retirement

Plaintiff and Defendants dispute whether to characterize Plaintiff's retirement as a decision he made because the interaction with administration had become insufferable or whether Plaintiff was constructively discharged by the creation of overly hostile, unprofessional, and objectively unbearable work conditions. Plaintiff testified that he complained to Dr. Weber about the excessive observations with no feedback and told him that he was looking to curtail the repetition of visits so that it was more manageable and less stressful. Butt Defendants contend that Plaintiff hardly described a hostile and intolerable work atmosphere in his deposition. The parties do agree that, in general, Plaintiff's interactions with other teachers did stop whilst he was on full review. Further, while no teacher stated that they stopped interacting with Plaintiff due to his full review status, Plaintiff felt that teachers were afraid to interact with him due to fear or retaliation. In addition, similar to when he was first placed on full review, Plaintiff claims that Dr. Van Dam, the EAP Consultant, repeatedly told him that, because of his age and stress, he should retire.

Plaintiff claims that the demeanor of his peers, the dismissiveness of the four administrators, the lack of feedback, and the generally hostile environment made it too difficult for him to continue performing his job.

## VI. Other Teacher Comparators

Plaintiff alleges that other teachers within the age-protected class were also unnecessarily put on full review by McDermott. In his Complaint, Plaintiff specifically alleged that "[a] number of 'older' teachers," including Irving Sloan and Mike Katz, "were subjected to 'heightened' scrutiny for the sole purpose of attempting to manage them out of the District." (Compl. ¶ 13 n.1.) There are additional individuals whom Plaintiff argues are also proper comparators, but whom Defendants dispute as "teachers." In sum, the individuals the parties agree are potentially

appropriate comparators are:

1. **Caran Pullen**: She was placed on full review as well as a Teacher Improvement Plan on or about November 1, 2013. She was born in 1962 and was hired by the district in 2002, when she was forty years old. Pullen alleged that McDermott asked her when she was going to retire and told her that if she agreed to retire in a year or two, he would "lessen the pressure."

2. **Harvey Flisser**: He was put on full review after incidents with students in which he allegedly demonstrated poor professional judgment. Scarsdale had also received repeated student/parent complaints about his inconsistent teaching practices; for example, having material on tests that had not been covered in class and not connecting with his students and/or saying inappropriate obscenities to students.

3. **Dorothy Golden**: The parties dispute whether Golden was ever formally put on full review, though Plaintiff claims that she told him she under full review.

4. **Marjorie Najac**: The parties agree that Najac was at least a House Counselor at Scarsdale but dispute whether she was also a teacher. Najac was placed on full review because of her performance issues as a House Counselor, including attention issues, lateness, failure to appear for meetings without prior notification, and issues or poor communication with teachers on the house team.

5. **Steven Goodman**: Goodman was born in 1970 and was over forty when two incidents happened for which he was not put on full review. Plaintiff describes one in which, during a fire drill, he got in another teacher's face and allegedly yelled at her in front of students and teachers. In another, he allegedly got so belligerent with one professor that he went across the table to him. The parties dispute whether Goodman was ever disciplined for these behaviors.

## VII.    SUFD Demographics

During the 2014/2015 school year, 66% of the District's teaching staff were over the age of forty and 63% of the middle school teachers were over the age of forty. Between 2009/2010 and 2014/2015, at least 62% of the District's teaching staff each year were over the age of forty. Between 2009/2010 and 2014/2015, at least 57% of the Scarsdale Middle School teaching staff each year were over the age of forty. There were no budgetary incentives related to teacher salary that would be impacted by replacing more senior teachers with younger teachers. There was no effect upon McDermott's compensation or his budget management if he could lower the cost of

the teaching population.

## VIII.    SUFD's Equal Employment Opportunity Policy and Regulation

The District has a policy entitled Equal Employment Opportunity ("EEO"). The EEO provides that the "Board of Education, its officers, and employees shall not discriminate against any employee or applicant for employment on the basis of race, color, national origin, creed or religion, marital status, sex, sexual orientation, age, or disability. Furthermore, District Policy 9520 governs all staff complaints and grievances. The Policy provides that staff complaints and grievance procedures are defined in CBAs.

## IX.    Procedural History

Plaintiff filed a Charge of age discrimination with the Equal Employment Opportunity Commission ("EEOC") and New York State Division of Human Rights on March 31, 2015. Plaintiff filed a notice of claim with the District on May 21, 2015. Plaintiff appeared for a 50-h Examination on July 16, 2015 and answered questions under oath. The EEOC issued a "right-to-sue" letter on February 17, 2016. Plaintiff filed the instant lawsuit on May 12, 2016. Defendants filed their Motion for Summary Judgment on August 13, 2018.

## LEGAL STANDARDS

## I.    Summary Judgment

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents . . . [and] affidavits or declarations," *see* Fed. R. Civ. P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986). The moving party may support an assertion that there is no genuine dispute of a particular fact by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the nonmoving party to raise the existence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1)(A); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008); *Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013) (summary order). Courts must "draw all rational inferences in the non-movant's favor," while reviewing the record. *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 224 (2d Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Importantly, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson*, 477 U.S. at 249; *see also Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). Rather, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Anderson*, 477 U.S. at 250. Summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

Critically, in an opposition to a motion for summary judgment "[s]tatements that are devoid of any specifics, but replete with conclusions" will not suffice. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d

Cir. 2010) (nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation" (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998))).

## II. Age Discrimination under Federal and State Law

Under the ADEA and NYHRL, it is unlawful for an employer to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age. *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001) (citing 29 U.S.C. § 623(a)(l)). The framework for analyzing these claims is as follows: First, plaintiff bears the burden of establishing a prima facie case of age discrimination by showing that: (i) at the relevant time the plaintiff was a member of the protected class; (ii) the plaintiff was qualified for the job; (iii) the plaintiff suffered an adverse employment action; and (iv) the adverse employment action occurred under circumstances giving rise to an inference of discrimination, such as the fact that the plaintiff was replaced by someone "substantially younger," *Id*. (citing *O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 313, 116 S.Ct. 1307 (1996).

Second, if plaintiff succeeds, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its adverse employment action. *Id*. (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817 (1973); *James v. New York Racing Ass'n*, 233 F.3d 149, 153 (2d Cir.2000) (applying *McDonnell Douglas* to ADEA claim). Finally, if the employer articulates a legitimate, nondiscriminatory reason for its actions, the burden is on the plaintiff to show that the proffered nondiscriminatory reason was merely a pretext for discrimination. *Id*. (citing *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

Within this framework, "[t]he burden on the plaintiff of presenting a *prima facie* case under *McDonnell Douglas* is 'minimal.'" *Id.* citing *James v. New York Racing Ass'n,* 233 F.3d 149, 153 (2d Cir.2000). At the same time, there are some nuances to the third and fourth elements. For example, a plaintiff sustains a materially adverse employment action if he or she is subject to a materially adverse change in the terms and conditions of employment. *Galadya v. NYC Board of Education,* 202 F.3d 636 (2d Cir. 2000). The "adverse change" need not be construed too narrowly. Examples include: termination, demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significant diminished material responsibilities, or other indices … unique to a particular situation. *Id.; Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997) (ADEA protects the employee against "less flagrant reprisals" than termination or a reduction in wages and benefits).

Similarly, a constructive discharge constitutes an adverse employment action. *Shapiro v. NY.C. Dep't of Educ.*, 561 F. Supp. 2d 413, 424 (S.D.N.Y. 2008). A "constructive discharge occurs when an employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation. *Trachtenberg v. Dep't of Educ. of City of New York,* 937 F. Supp. 2d 460 (S.D.N.Y. 2013). Working conditions are intolerable when, viewed as a whole, they are "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Bauers-Toy v. Clarence Cent. Sch. Dist.,* 2014 U.S. Dist. LEXIS 60358, at *87-88 (W.D.N.Y. Feb. 6, 2014, No. 10-CV-00845).

Regarding the fourth element, the inference of discrimination, courts are permitted to— and typically must—assess a body of circumstantial evidence to infer discriminatory intent as a motivating factor behind the adverse employment action. *Littlejohn v. City of New York*, 795 F.3d

297,313 (2d Cir. 2015), *see also Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996) (circumstances that give rise to an inference of discriminatory motive include actions or remarks made by decision makers that could be viewed as reflecting a discriminatory animus) (citations omitted) and preferential treatment given to employees outside the protected class); *Washington v. Garrett*, 10 F.3d 1421, 1434 (9th Cir. 1993). Moreover, Plaintiff need not show that age was the only factor herein, but that age was a determinative factor. *Stratton v. Dept. for the Aging,* 132 F.3d 869 (2d Cir. 1997); *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 508 (2d Cir. 1994), *Levin v. Analysis & Technology, Inc.,* 960 F.2d 314, 316-17 (2d Cir. 1992). Plaintiff may prove that age was a motivating factor through the presentation of either direct or circumstantial evidence. *Kirsch v. Fleet Street Ltd.,* 148 F.3d 149, 162 (2d Cir. 1998).

Lastly, as with claims raised under Title VII, a Plaintiff can show age discrimination based on a hostile work environment or on disparate treatment.

### III. Hostile Work Environment

Hostile work environment claims are analyzed the same way under Title VII and ADEA. *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003). To prevail on a hostile work environment claim, a plaintiff must first show that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Second, he must demonstrate a specific basis for imputing the conduct creating the hostile work environment to the employer. *Feingold v. New York,* 366 F.3d 138, 149-50 (2d Cir. 2004).

Proving the existence of a hostile work environment involves showing both "objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment' and the victim must also subjectively perceive that environment to be abusive." *Alfano v. Costello,* 294 F.3d 365, 373 (2d Cir. 2002). "As a

general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Id*. at 374 (quoting *Perry v. Ethan Allen, Inc*., 115 F.3d 143, 149 (2d Cir. 1997)). To assess a hostile work environment, courts can consider the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with [the] employee's work performance. *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21, 114 S.Ct. 367 (1993).

## IV. Disparate Impact

In order to establish a *prima facie* case of disparate impact under the ADEA, a plaintiff must show "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *Attard v. City of New York*, 451 F. App'x 21, 24 (2d Cir. 2011) (citing *Tsombanidis v. W. Haven Fire Dep't,* 352 F.3d 565, 575 (2d Cir.2003); *Reg'l Econ. Cmty. Action Program v. City of Middletown,* 294 F.3d 35, 52–53 (2d Cir.2002)). Notably, showing age discrimination through disparate impact is more difficult under the ADEA than under Title VII. In *Smith v. City of Jackson, Miss*., 544 U.S. 228, 228, 125 S. Ct. 1536, 1538 (2005), the Supreme Court explained that the ADEA allows recovery in disparate-impact cases, comparable to *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S. Ct. 849 (1971). But, it clarified, unlike Title VII, the scope of the ADEA is far narrower for cognizable disparate impact claims. *Smith*, 544 U.S. at 228 ("Unlike Title VII, however, ADEA § 4(f)(1) significantly narrows its coverage by permitting any 'otherwise prohibited' action 'where the differentiation is based on reasonable factors other than age'"); *Id*. ("Two textual differences between the ADEA and Title VII make clear that the disparate-impact theory's scope is narrower under the ADEA than under Title VII.").

**DISCUSSION**

Defendants argue that Plaintiff's discrimination and constructive discharge claims fail on the pleadings and on the law because Plaintiff was terminated for performance-based reasons. Before discussing these merits arguments, Defendants also raise several threshold issues, arguing that: 1) Plaintiff's ADEA claims are barred by the statute of limitations, 2) the notice of claim do not include allegations of disparate impact and hostile work environment, and 3) the ADEA claims are not actionable because of lack of provable damages. The Court addresses these in turn.

**I.     Statute of Limitations**

Defendants argue that because, in New York, a complaint must be filed with the EEOC within 300 days of the alleged discriminatory act, the 300-day period effectively acts as a statute of limitations. (Defendants Memorandum in Support of Summary Judgment, ("Def. Mem.") at 3, ECF No. 32.) Based on this 300-day limitations period for age discrimination claims, Defendants argue that any claims of incidents that occurred prior to June 4, 2014 cannot serve as the basis for any of plaintiff's ADEA claims. (*Id*.) Therefore, allegations in the Complaint that occurred prior to June 4, 2014 are time-barred, including allegations involving the first period of full review, which was in 2010, and the May 5, 2014 decision to place Plaintiff on full review. (*Id*. at 3-4.)

In support of their position, Defendants argue that "the proper focus [in an employment discrimination case] is on the time of the discriminatory act, not the point at which the consequences of the act become painful," *id*. (citing *Chardon v. Fernandez*, 454 U.S. 6, 8, 102 S.Ct. 28 (1981)), and therefore "the timeliness of a discrimination decision is from the date the claimant receives notice of the allegedly discriminatory decision, not from the date the decision takes effect." (*Id*.) (citing *Jordan v. Bates USA*, 4 F. App'x 73, 76 (2d Cir. 2001)).

Plaintiff argues that the ADEA claims are not time barred because he has alleged that he

was constructively discharged, and the Second Circuit, under *Flaherty v. Metromail Corp.*, 235 F.3d 133 (2d Cir. 2000), holds that a constructive discharge claims accrue on the date the Plaintiff gives definite notice of the intention to retire, and the acts of discrimination that occurred outside the 300-day limitations period are timely under the continuing violations doctrine because they were part of the ongoing practice of discriminating against older teachers. (Pl. Opp. at 5-6.) The Court agrees with Plaintiff.

Defendants are correct that to raise an ADEA claim in New York, a complaint must be filed with the EEOC within 300 days of the alleged discriminatory act. 29 U.S.C. §§ 626(d), 633(b); *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906-07 (2d Cir. 1997). Both parties agree that Plaintiff filed his EEOC charge on March 31, 2015 and served his Notice of Intention to Retire on January 13, 2015. The parties disagree as to whether this timing suffices for the discrimination claim and the constructive discharge claim.

Plaintiff argues that because the EEOC charge was filed within 80 days of Plaintiff's Notice to Retire, it is timely. (Pl. Opp. at 6.) Plaintiff is correct that in *Flaherty*, the Second Circuit unequivocally held that "[a] court *must find a constructive discharge where the employee resigns* because an employer causes to exist conditions of such an unpleasant or difficult nature that any reasonable person in the employee's place would do the same." 235 F.3d at 138. The Court explained that this is so because in constructive discharge cases, "the actionable conduct is not a discrete, identifiable act on the part of the defendant" but is a claim that an employer made an employee's job conditions so intolerable that a reasonable person would feel forced to resign. *Id.* Plaintiff has pleaded such a claim. Accordingly, the constructive discharge claim is timely.

As for the hostile work environment and disparate impact claims, the Court agrees with Plaintiff that they are not time-barred under the continuing violations doctrine. Under this doctrine,

17

when "a plaintiff experience[s] a 'continuous practice and policy of discrimination, ... the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.'" *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 249 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013) (applying continuing violations doctrine to statute of limitations with New York State age discrimination claims) (citing *Gomes v. Avco Corp.*, 964 F.2d 1330, 1333 (2d Cir.1992) (applying continuing act violations doctrine to Title VII claim and timing of EEOC charge, explaining that "the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.")); *see also Miller v. Int'l Tel. & Tel. Corp.*, 755 F.2d 20, 25 (2d Cir. 1985) (applying continuous violations doctrine to ADEA claim and explaining that "[w]hen employees are hired or refused employment pursuant to a continuous practice and policy of discrimination, the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it"). Here, the final act related to the discrimination was Plaintiff's decision to resign, which he did by letter, on January 13, 2015. Plaintiff's filing of the EEOC charge within 80 days of resigning, which contained ample details coloring all of his federal and state claims, satisfies the statute of limitations under federal law.

Defendants reliance on *Jordan v. Bates USA*, 4 F. App'x 73, 76 (2d Cir. 2001) is misguided. There, Judge Rakoff held that the statute of limitations began to run on the earliest date on which the employee received "a definite notice of termination," which was before he received a formal letter. *Id*. That reasoning is inapposite here, where there is no single discreet discriminatory act alleged to have occurred at an earlier time than the constructive discharge. Rather, Plaintiff argues that being placed on full review was the *beginning*, not the end, of a period of discriminatory treatment. Plaintiff pleads that he was placed on full review twice, during which he was constantly observed and never provided with feedback, during which time other professors were not

disciplined for similar infractions to his, and after which Plaintiff received an unnecessary negative performance reviews. He alleges that these acts, combined with the unbearable atmosphere and evidence that younger teachers were treated preferentially, revealed age discrimination. (*See* Compl. ¶ 46). Defendants arguments that the discreet acts of discrimination are either: 1) giving Plaintiff a memorandum relaying that he would be placed on full review, or 2) issuing the unsatisfactory job performance are misguided. The date of Plaintiff's resignation, which he claims was a constructive discharge, is the time stamp.

Accordingly, the Court finds that all claims have been timely filed.

## II.   Failure to Plead in Notice of Claim

Defendants next argue that Plaintiff's NYSHRL claim should be dismissed for his failure to include allegations of disparate treatment and a hostile work environment in a notice of claim in compliance with New York Education Law § 3813, which requires that a notice of claim contain a verified statement signed by the claimant for all actions commenced against a school district. (Def. Mem at 7.) Defendants add that since Plaintiff's disparate treatment claim was not directly or indirectly mentioned in the notice of claim, that state law claim should also be dismissed with prejudice. (*Id.*)

Plaintiff argues that the Second Circuit is still undecided as to whether a NYSHRL claim against a school district even requires a Notice of Claim, (*see* Pl. Opp. at 29) (citing *Berrie v. Bd. of Educ.*, 2017 U.S. Dist. LEXIS 83623, at *220 (S.D.N.Y. May 31, 2017), and that the requirement can be satisfied "by delivery of *any document* sufficiently formal and detailed for the District to investigate the claims." (*Id.*)

The Court agrees with Plaintiff. In both *Berrie* and *Melton v. Poughkeepsie City Sch. Dist.,* 2017 U.S. Dist. LEXIS 207539 (S.D.N.Y. Dec. 18, 2017), this Court explained that the

plain language of § 3813 does not require a formal notice of claim but instead requires that the claims must have been presented to the district or school within three months after the accrual of such claim. In those cases, Judge Bricetti and Judge Seibel both declined to dismiss the NYSHRL claims, finding that the plaintiffs timely filed EEOC charges and sent letters to the district outlining and explaining their allegations of discrimination. Both judges found these alternatives to comply with the § 3813(1) notice requirement. *Berrie*, 2017 U.S. Dist. LEXIS 83623, at *23-24; *Melton,* 2017 U.S. Dist. LEXIS 207539, at *20. This Court does as well.

Plaintiff sent a letter to the Assistant Superintendent for Personnel, as required in his CBA. The letter reflected his intent to retire due to the perceived hostile work environment, which made the work place "unprofessional and objectively unbearable" and SUFD's efforts to "manage [him] out." (*See* January 13, 2015 letter to Dr. Joan Weber, Ex. 19, ECF No. 35). He then had his lawyer send SUFD's legal counsel, in fact, the same counsel representing SUFD in this litigation, a detailed letter explaining his grievances and the basis for his intended lawsuit on February 4, 2015. (Ex. 5, ECF No. 35.) Plaintiff then filed a detailed complaint with the EEOC on May 13, 2015. (Ex. C, ECF No. 31). He filed his New York State notice of claim on May 21, 2015. (Ex D, ECF No. 31). He then submitted a three-page position statement to supplement his EEOC charge on May 30, 2015, which relayed in detail Plaintiff's grounds for age discrimination and constructive discharge, including the facts that color his hostile work environment and disparate impact theories. Defendants replied to Plaintiff's EEOC charge on July 15, 2015. (*See* Pl. Opp. at 30.) Therefore, Defendants had ample notice of Plaintiff's constructive discharge and age discrimination claims, including under the hostile work environment and disparate impact theories. Accordingly, Plaintiff's New York State and federal claims are appropriately before this Court on the bases of

administrative exhaustion and adequate notice.

### III. ADEA Claims Actionable

Defendants next argue that Plaintiff's ADEA claims are not actionable because the ADEA claims for a hostile work environment and disparate treatment lack provable damages. Specifically, Defendants argue that because the ADEA protects employees over forty against age-based discrimination relating to "compensation, terms, conditions, or privileges of employment," ADEA, 29 U.S.C. § 623(a)(1), the only make-whole remedies are back pay, front pay, and reinstatement. (Def. Mem. at 7-8) (citing *Lowe v. Commack Union Free Sch. Dist*., 886 F.2d 1364 (2d Cir. 1989)). They add that none of Plaintiff's allegations, supporting his disparate treatment or hostile work environment claims, demonstrate that Plaintiff suffered any pecuniary or economic damages because, at all times that Plaintiff was employed by SUFD, he continued to receive his full pay and benefits. (*Id*. at 8.) Lastly, Defendants argue that because of the limited remedies available under ADEA, Plaintiff cannot recover compensatory damages for pain and suffering or emotional distress. (*Id*.)

Plaintiff argues that the allegations in the Complaint, and the evidence in the record, support his claim that he suffered damages due to the discriminatory acts of defendants in violation of the ADEA. (Pl. Opp. at 28.) He notes that in paragraph 52, he alleges financial damages "due to a full year of lost salary and a reduction pension benefits for which [he] is entitled to an award of monetary damages and other relief." (*Id*.; Compl. ¶ 52.) Plaintiff adds that, as the ADEA allows a plaintiff to recover liquidated or double damages where the statutory violation was "willful," he could well be entitled to liquidated damages as well. (Pl. Opp. at 28.)

The Court agrees with Plaintiff in part and with Defendants in part. As to Plaintiff's request for compensatory and/or punitive damages in relation to his suffering emotional distress,

Defendants are correct that it is well-settled that the ADEA does not allow plaintiffs to recover for emotional distress, pain and suffering, or any other non-economic damage. *Meyers v. I.B.M. Corp.*, 335 F. Supp. 2d 405, 411 (S.D.N.Y. 2004). It appears, however, that NYHRL does. (*Id.*) ("While the HRL permits recovery of compensatory damages, the ADEA does not.") Therefore, Plaintiff's ADEA claim will not invite any compensatory damages for emotional distress or pain and suffering, though his HRL claims may.

As far as the requirement for Plaintiff to show damages *at all* in order to sustain an ADEA claim, Plaintiff correctly notes that front pay has long been regarded as an acceptable remedy when age discrimination causes an individual to end their employment prior to when they would have otherwise retired. *See Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 729 (2d Cir. 1984) (explaining that the plaintiff was entitled to front pay where reinstatement would be impracticable, and plaintiff would have likely worked until lawful mandatory retirement age of 70).

Here, Plaintiff adduced proof that he had intended to retire at the end of the 2015-2016 school year, but only resigned earlier due to what he perceived as an insufferable work environment. (*See* Letter of Retirement, Ex. X, ECF No. 31; Weber Dep. Ex. 2, ECF No. 35, at 121.)[2] Further, under the principles in *Whittlesey*, the Court could calculate an appropriate sum of damages for front pay, regardless of the possibility of Plaintiff being reinstated or receiving liquidated damages and make any adjustments necessary to offset Plaintiff's already retrieved compensation/bonus.

---

[2] Plaintiff's retirement letter reads:

> Further, be advised that I submit this letter without prejudice to my claims for age discrimination. I am awaiting a response by the School District to my settlement demand, but did not want to be time barred from receiving this retirement incentive. I had planned to teach another year, but my circumstance has become intolerable as the School District intensified its efforts to "manage me out" by making my work place hostile, unprofessional and objectively unbearable.

Accordingly, Plaintiff's ADEA claims are ripe and actionable. Having addressed all threshold matters, the Court now addresses Defendants arguments on the merits.

## IV.    Sufficiency of the Pleadings[3]

Defendants argue that amongst all of Plaintiff's claims, only constructive discharge is properly pleaded under Fed. R. Civ. P. 12(b)(6). (Def. Mem. at 5.) They argue that Plaintiff's claims for age discrimination, disparate impact, and hostile work environment under federal and state law are all insufficiently pleaded, based on the Complaint, the EEOC Charge form, and the Notice of Charge form. For the reasons stated below, the Court disagrees.

Under Rule 12(b)(6), the inquiry for motions to dismiss is whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. The Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, but the Court is "'not bound to accept as true a legal conclusion couched as a factual allegation,'" or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). In determining whether a complaint states a plausible claim for relief, a district court must consider the context and "draw on its judicial experience and common sense." *Id*. at 679. A claim is facially plausible when the factual content pleaded allows a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

---

[3] Defendants throw in the kitchen sink with their arguments in this motion, providing the Court with no explanation for why all the issues related to justiciability and pleading sufficiency were not raised at earlier junctures. The Court will allow it this once. It is not appropriate for Defendants to hoard all their claims and arguments for the very end of litigation in a waste of judicial and client resources. Similar conduct, if employed during trial, will not be permitted.

Further, the Second Circuit has repeatedly held that "[c]laims not raised in an EEOC complaint … may be brought in federal court if they are 'reasonably related' to the claim filed with the agency." *Williams v. New York City Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006); *Fitzgerald v. Henderson,* 251 F.3d 345, 359–60 (2d Cir.2001) ("[a] claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made."); *see also Butts v. City of New York Dep't of Hous. Pres. & Dev*., 990 F.2d 1397, 1401 (2d Cir.1993).

> [T]he focus should be on the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving. The central question is whether the complaint filed with the EEOC gave that agency adequate notice to investigate discrimination on both bases. The reasonably related exception to the exhaustion requirement is essentially an allowance of loose pleading and is based on the recognition that EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims [he] is suffering.

*Williams,* 458 F.3d at 70 (internal citations and quotation marks omitted).

## A. Age Discrimination

A *prima facie* claim of age discrimination under ADEA and NYSHRL requires alleging that: (i) at the relevant time the plaintiff was a member of the protected class; (ii) the plaintiff was qualified for the job; (iii) the plaintiff suffered an adverse employment action; and (iv) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Roge v. NYP Holdings, Inc.*, 257 F.3d at 168. If an employer, articulates some legitimate, nondiscriminatory reason for its adverse employment action, it also requires the plaintiff to allege that the proffered nondiscriminatory reason was merely a pretext for discrimination. *James v. New York Racing Ass'n*, 233 F.3d at 153.

Here, both the Complaint and the EEOC Charge relate that Plaintiff was 63 years old at the time of his alleged constructive discharge. (Compl. ¶ 1; EEOC Charge Stmt. at 1, Ex. C, ECF No.

31.) Therefore, Plaintiff has adequately pleaded that he was over forty and a member of the protected class. Similarly, both the Complaint and EEOC relate that Plaintiff was qualified for his job, satisfying the second element. (*See* Compl. ¶¶ 10-11) ("Mr. Walsh was hired as a middle school mathematics teacher in the SUFSD in 1995. Mr. Walsh was granted tenure, when he was first eligible, in 1998."); (EEOC Charge Stmt. at 1) ("Mr. Walsh, at the time of his discharge, had been a dedicated, tenured Math teacher at Scarsdale Middle School for almost 20 years …. Mr. Walsh had served as a math teacher with an unblemished record for over 15 years").

As to the adverse employment action, the Complaint alleges a constructive discharge. (*See* Compl. ¶ 41) ("The Defendants ultimately succeeded in forcing Mr. Walsh to retire with their last unfounded campaign of harassment.") As does the EEOC Charge. (EEOC Charge Stmt. at 3.) ("The District was not interested in Mr. Walsh's professional development or his behavior. Rather, their sole motive was to coerce his early retirement and, if unsuccessful, the District needed a pretense to terminate him in order to replace him with a younger, less expensive, teacher. The District ultimately succeeded in forcing Mr. Walsh to retire with the last unfounded campaign of harassment.") And, as stated before, a constructive discharge constitutes an adverse employment action. *Shapiro*, 561 F. Supp. 2d at 424.

That leaves open only whether Plaintiff alleged enough facts to allow a jury to draw the inference that age was a but for cause of Plaintiff's termination and whether Defendants' proffered reasons for disciplining/constructively discharging Plaintiff were pretextual. The Court finds that Plaintiff has adequately pleaded discriminatory intent and pretext. For example, Plaintiff alleges:

- "For his first fifteen (15) years as a teacher, Mr. Walsh had an unblemished record and he routinely received praise for his teaching, camaraderie, manner with his students, and relationships and interactions with parents." (Compl. ¶ 12.)

- "Mr. Walsh's ouster was part of a larger pattern utilized by the SUFSD to force out older, more highly compensated teachers, so that the SUFSD could replace them

with younger, lower-salaried teachers. This technique was cloaked under the guise of performance issues; however, it was motivated by one thing—removing older teachers to save money." (*Id*. ¶ 13.)

- "As Mr. Walsh began to advance in age, the SUFSD and Mr. McDermott became determined to find a way to remove him, despite his stellar career as a mathematics teacher. The SUFSD and Mr. McDermott were ready to seize on any type of perceived issue so that they could build a 'record' to justify the planned ouster of Mr. Walsh." (*Id*. ¶ 14.)

- "At or about the end of the 2010 school year, the SUFSD and Mr. McDermott finally saw the very opportunity they sought to justify Mr. Walsh's planned ouster. Prior to this period, Mr. Walsh had never been advised of any alleged concerns or complaints, by a student or a parent, related to his teaching or classroom conduct. He had an unblemished record of satisfactory reviews and performance ratings. he was granted tenure, when first eligible, without a hint of concern or question." (*Id*. ¶ 15; ¶ 15 n.2.)

- In a clear and utter overreaction, purportedly based on this single incident, Mr. McDermott placed Mr. Walsh on "full review" for the following year, and made a mandatory Supervisory Referral to Dr. Irma Van Dam, the Employee Assistance Psychologist. Mr. McDermott further advised Mr. Walsh that he would be observed both formally and informally over the course of the next year with an administrator observing at least one of his classes daily. These punitive actions were unwarranted and implemented only as a pretext for attempting to "manage" Mr. Walsh out. None of these actions was designed to improve Mr. Walsh's performance, or to insulate students from any inappropriate behavior whatsoever. In fact, *Mr. Walsh was not actually given any feedback and he never received the daily supervision with which he had been threatened*. (*Id*. ¶ 19) (emphasis added.)

- "Mr. Walsh met with Dr. Van Dam who advised him that there was nothing "wrong" with him, that he did not need counseling, and he should continue to do what he had for fifteen (15) years. Notwithstanding this advice, and presumably at the behest of the principal, *Dr. Van Dam suggested numerous times that he should " consider" retirement*." (*Id*. ¶ 20) (emphasis added.)

- "Mr. Walsh *neither received any feedback at all, nor was he counseled or advised regarding any deficiencie*s. This is telling because if the full review was for any legitimate, and non-discriminatory purpose, the SUFSD and Mr. McDermott would have surely followed up with Mr. Walsh and made sure that the allegedly "inappropriate" behavior that had led to his "unsatisfactory" rating was corrected." (*Id*. ¶ 21) (emphasis added.)

- "Mr. Walsh was accused wrongfully of audibly using foul language in commenting to an unidentified colleague about the mismanagement of testing procedures and the potential disqualification of the state exam results. Mr. Walsh was contacted by

Mr. McDermott and was instructed to be in his office on a certain date with his union representative." (*Id*. ¶ 32.)

- "Seizing solely upon this alleged incident, Mr. McDermott rated Mr. Walsh as "unsatisfactory" in his Professional Performance Review for the 2013-14 school year. In addition to this proctoring incident, Mr. McDermott premised the "unsatisfactory rating" on four (4) additional alleged deficiencies, three of them. completely invented, and of which Mr. Walsh had never been advised, warned or counseled about; (1) his lateness (of less than ten (10) minutes) to school on two (2) dates (discussed); (2) unspecified reports of inappropriate interaction with students in other colleagues' classes (invented); (3) unspecified improper interactions with his students (invented); and (4) communication about students to parents (invented)." (*Id*. ¶ 33.)

- "Again, Mr. Walsh was referred to Dr. Irma Van Dam and put on 'full review,' and *again, further counseling was determined to be unwarranted*. However, Dr. Van Dam requested that Mr. Walsh check in with her again during the first few months of the new term, and once again, presumably at the behest of Mr. McDermott, *urged Mr. Walsh to strongly consider retiring earlier than he had planned*." (*Id*. ¶ 34) (emphasis added.)

- "In the first four months of the 2014-15 school year, Mr. Walsh was observed an *unprecedented thirty-one (31) times and an additional twenty (20) times thereafter. Only two of those were formal reviews and both resulted in 'Satisfactory' rating -- the highest available*. Of the twenty-nine (29) unannounced informal full period observations, conducted by any of four administrators, including Mr. McDermott, two assistant principals, and the other department chair, *Mr. Walsh received absolutely no feedback or advice on how to improve his performance or alter his behavior, all of which belie the genuineness of this second "full" review*." (*Id*. ¶ 37) (emphasis added.)

- "Several of Mr. Walsh's colleagues commented to him that *the level of observation and scrutiny that he was placed under by the SUFSD and Mr. McDermott was absolutely unheard of and completely without justification*. Furthermore, a more formal and structured review process formerly instituted and previously applied which emphasized continuity in each observation by having the same administrator observe a given class on multiple and subsequent days for continuity, providing weekly review and feedback, and assigning a mentor for ongoing counsel and support, were all abandoned in this instance…" (*Id*. ¶ 38) (emphasis added.)

- "The Defendants were not interested in Mr. Walsh's professional development or his behavior. Rather, *their sole motive was to coerce his early retirement and, if unsuccessful, the SUFSD needed a "record" to justify the termination of his employment* in order to replace him with a younger, less expensive, teacher." (*Id*. ¶ 40) (emphasis added.)

- "Mr. Walsh did not voluntarily retire, he was constructively discharged, because of his age and seniority. At the time of his constructive discharge, Mr. Walsh had been a dedicated tenured math teacher at Scarsdale Middle School for almost 20 years with an unblemished record but for the two minor incidents, which had been fabricated." (*Id*. ¶ 43.)

- "The SUDSD and Mr. McDermott stopped at nothing in order to remove Mr. Walsh' s salary from the school' s budget and to prevent Mr. Walsh from receiving his intended retirement benefits. The relentless, concerted, and unjustified campaign of harassment by the SUFSD and school principal, Mr. McDermott, aimed at forcing Mr. Walsh into early retirement…" (*Id*. ¶ 44.)

In short, the Complaint is replete with allegations supporting Plaintiff's position that his being placed on "full review," after being tenured and receiving nearly no parental or faculty complaints for over a decade, was a pretext to build a disciplinary record that could "justify" his termination. The EEOC charge, though shorter, contains similar allegations:

- "Mr. Walsh met with Dr. Van Dam who advised him that there was nothing 'wrong' with him, that he did not need counseling, and to continue to do what he had for 15 years. Notwithstanding this advice, presumably at the behest of the principal, she suggested numerous times that he should "consider" retirement. The observations proceeded sporadically for about a month, ended abruptly, and Mr. Walsh never received any feedback at all, nor [was] counseled or advised of any deficiencies." (EEOC Charge at 2.)

- "The District's objective was not to help Mr. Walsh change any behavior, but to amp up the pressure on him to retire early. Mr. Walsh was not assigned a mentor, received no counsel, and received no feedback. In the first four months of the 2014-2015 school year, Mr. Walsh was observed an unprecedented 31 times. Only two of those were formal reviews and both resulted in 'Satisfactory' rating-the highest available. Of the 29 informal observations, he received no feedback or advice on how to improve his performance or alter his behavior, all of which belie the bona fides of his 'full' review." (*Id*. at 3.)

The Court considers both the Complaint and EEOC Charge to be amply detailed to support Plaintiff's federal and state age discrimination claim. Accordingly, Defendants' Motion to Dismiss Plaintiff's discrimination claims on insufficient pleading grounds is DENIED.

## B. Hostile Work Environment

Before analyzing the sufficiency of Plaintiff's claim for age discrimination under a hostile work environment theory, the Court underscores its previous finding that Plaintiff need not actually allege a separate hostile work environment nor disparate impact claim in either document in order to properly plead such claims. Under, *Williams*, "[c]laims not raised in an EEOC complaint … may be brought in federal court if they are 'reasonably related' to the claim filed with the agency." 458 F.3d at 70. Here, there is no question that the hostile work environment and disparate impact claims all relate to Plaintiff's claim for age discrimination. They are cuts of the same wood. But because the Court believes Plaintiff has adequately pleaded these claims as well, it will briefly discuss the allegations supporting them.

To properly plead a hostile work environment claim, a plaintiff must allege that: 1) the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and 2) that there is a specific basis for imputing the conduct creating the hostile work environment to the employer. *Feingold v. New York,* 366 F.3d at 149-50. In both the Complaint and EEOC Charge, Plaintiff complains about the unprecedented number of informal reviews that were conducted within his classroom, in response to which he was never counseled, but which ultimately resulted in his receiving unsatisfactory performance reviews. In his Complaint, Plaintiff discusses how this number of reviews completely undermined him, gave him an aggravated ulcer, and "made it impossible for him to perform at the stellar level at which he had performed for nearly two (2) decades." (Compl. ¶ 42.) Both documents reflect that the full reviews were ordered by McDermott (EEOC Charge at 1,3.) At the pleading stage, such allegations are sufficient to make a hostile work environment claim plausible.

### C. Disparate Impact

Turning to the disparate impact claim, in order plead a *prima facie* case of disparate impact under the ADEA, a plaintiff must show "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *Attard v. City of New York*, 451 F. App'x at 24. By a thread, Plaintiff makes sufficient allegations for this claim in his Complaint. He states:

> *A number of "older" teachers were subjected to "heightened" scrutiny for the sole purpose of attempting to manage them out of the district.* This technique was used on Irving Sloan, Mike Katz, Harvey Flisser, and Caren Pullen. *By way of example only*, Ms. Pullen, a teacher who was on staff at the time of Mr. Walsh' s ouster, was told by Mr. McDermott that he would "back off" from her frequent observations if she would announce her retirement. Ms. Pullen immediately reported this inappropriate behavior to Dr. Weber, the Assistant Superintendent for Personnel. Unfortunately, Dr. Weber did nothing to curb or stop the utilization of this management technique to coerce Mr. Walsh' s early, forced resignation. On information and belief, the SUFSD and Mr. McDermott stopped their harassment of Ms. Pullen solely due to the fact that Mr. Walsh filed a charge with the EEOC as a result of their unjustified campaign of harassment against him due to his age.

(Compl. P 13. n.1.) Hence, Plaintiff makes a plausible allegation that a disproportionate number of teachers in his age category were subject to "heightened scrutiny" and put on full review for the similar purpose of being "managed out" of the district. Accordingly, Plaintiff's disparate impact claim, too, survives.

Having addressed all the pleading issues that Defendants raise, the Court, alas, turns to the crux of the dispute—whether Plaintiff has produced sufficient evidence to allow his claims to survive past summary judgment.

## V.  Sufficiency of the Evidence

Defendants argue that Plaintiff has failed to adduce evidence to sustain his constructive discharge and hostile work environment claims.[4] The Court disagrees. It begins it analysis with the hostile work environment claim.

### A.  Hostile Work Environment

Defendants argue that Plaintiff has failed to establish a hostile work environment claim because he failed to show that the workplace was "permeated with discriminatory intimidation, ridicule and insult" that was "sufficiently severe or pervasive to alter the conditions of the [P]laintiff's employment" and that it "created an abusive working environment" (Def. Mem. at 9) (citing *Harris v. Forklift Sys.,* 510 U.S. at 21.) They add that the hostility of the work environment is assessed on the totality of circumstances, including: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance. (*Id*. at 10) (citing *Harris*, 510 U.S. at 23). Further, they note that the analysis is both subjective and objective. (*Id*.)

Plaintiff does not dispute the legal standard but posits that the treatment he endured was "intolerable for many reasons." (Pl. Opp. at 19.) For example, Plaintiff mentions that he was:

- "Subjected to an unprecedented number of observations, but given no feedback or administrative support" (*Id*.);

---

[4] Because Defendants comingled a motion to dismiss and motion for summary judgment into one motion, their briefs only address whether Plaintiff sustained a claim for age discrimination based on disparate impact in its pleadings. This Court already ruled that Plaintiff has met the minimum burden to sustain his claim. Defendants have not moved for summary judgment on the disparate impact claim or provided any reasons why it is unsustainable. As such, Plaintiff's claim for disparate impact survives this juncture.

- "His authority was undermined and his statements led to believe he had done something terribly wrong" (*Id.*);

- "His colleagues shunned him for fear of reprisals, and he no longer enjoyed the respect of his fellow teachers." (*Id.*);

- "The stress of the constant observations affected his teaching" (*Id.*);

- "He developed an ulcer and felt terrible stress." (*Id.*);

- "He had been transferred out of the house where he had been on a team for his entire career and [ ] moved to a different one where no one had his back and he had nowhere to turn." (*Id.*);

- "His Union president did not support him" (*Id.*);

- "The Assistant Superintendent failed to address his complaint with any action at all." (*Id.*)

All these statements are supported by the evidentiary record. For example, Plaintiff claims that he had around 50-60 informal classroom reviews between the two periods of full review—around 10-12 the first time around and around 30-50 the second time around. (*See* Walsh Aff. Ex. 1, P 35, ECF No. 35.) In addition, evidence reflects that no one provided feedback, let alone negative feedback, to him throughout the review process, nor counseled him on how to improve his performance. In fact, he testified that, during the first review, Dr. Van Dam told him that he was doing fine and did not need to change anything with his teaching. (*See* EEOC Charge at 2.) Even Dr. Weber, the Assistant Superintendent of Human Resources testified that she knew about Plaintiff's complaints and discomfort and did not do anything to investigate his concerns beyond speaking with McDermott. (*See* Weber Dep. at 125-26)

Plaintiff also testified that he no longer had regular interactions, such as the lunches he had for many years, with his team members. (*Id*. 133:2.) And he mentioned that his general interaction with other teachers stopped. (*Id*. 133:19-22, 133:12-13) ("There were many times just informally where people who I would normally had communication with as colleagues, it stopped….there was much less interaction with people.") Although Plaintiff had no way of knowing his teachers intentions in distancing themselves from him, he testified that he believed it was because of his being on full review. (Walsh Dep. at 132:23- 133:6) ("It's not uncommon that when other teachers have gone on full review that the faculty is well aware of what is happening and people shared with me informally that they wanted to be supportive of me but they felt they had to keep their distance. There was a sense with people that they didn't want a spotlight on themselves by being overly supportive.") He also testified that he had minimal interactions with his administrators, and those he had were all "critical" in nature. (Walsh Dep. 130:16-20.) And it is undisputed that, along with his full review, Plaintiff was indeed assigned to work in a new wing of the school than the one he had been assigned to for most of his teaching career.

The Court has no doubt that Plaintiff's environment underwent a strong change as soon as McDermott placed Plaintiff on full review status. If the goal of such a change of atmosphere was to deter behavioral infractions, perhaps such an environment could achieve that result. But, bafflingly, the attempt to achieve a goal is nowhere to be found in the record. And as such, the constraining environment has a cloud of arbitrariness hovering above it.

Further, while courts have often found that petty slights or legitimate disciplinary measures, including isolation, do not amount to a hostile work environment, they have also found that, in the right circumstances, they do. For example, in *Flowers v. N. Middlesex YMCA*, the Court denied the defendant's motion for summary judgment on a retaliation claim, explaining that it

could not be that "employer-orchestrated isolation at work" would never constitute a materially adverse action or dissuade an employee from complaining about harassing conduct. No. 3:15-CV-705, 2016 WL 1048751, at *8 (D. Conn. Mar. 11, 2016). It further explained that "[t]he social environment in a workplace can prove to be a powerful motivator; fear of employer-sponsored isolation 'might well' influence an employee's decision whether to 'mak[e] or support[ ] a charge of discrimination.'" *Id.* And it noted that no controlling precedent has ever precluded such a work environment from being severe enough to constitute an adverse employment action.

Because forcing an employee to work in hostile work environment is an adverse employment action, *Shapiro*, 561 F. Supp. 2d at 424, the principle above applies. Frequent petty occurrences and social isolation can constitute a hostile work environment. While no single factor that Plaintiff lists may be severe enough to deem his work environment hostile, the Second Circuit has held that "*the effect of a number of adverse conditions in the workplace is cumulative.*" *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81 (2d Cir. 1996) (emphasis added).

The Second Circuit has also explained that "the environment need not be 'unendurable' or 'intolerable.'" *Whidbee v. Garzarelli Food Specialties, Inc.* 223 F.3d 62, 70 (2d Cir. 2000). "Nor must the victim's 'psychological well-being be damaged.'" *Terry v. Ashcroft*, 336 F.3d 128 (2d Cir. 2003) (quoting *Fitzgerald v. Henderson*, 251 F.3d 345, 358 (2d Cir. 2001). Rather, in *Terry v. Ashcroft*, the Second Circuit explained:

> 'a work environment may be actionable if the conduct there is *either* so severe *or* so pervasive as to alter the working conditions of a reasonable employee. To the extent the district court suggested that conduct must always be severe *and* pervasive to be actionable under a hostile work environment theory, it was therefore mistaken.

(*Id*. at 149) (emphasis in original) (internal citation omitted). Hence, in *Terry*, the Second Circuit found that where Plaintiff was reassigned to a different office and suffered from regular, but non-severe, comments about his age, a jury could conclude that he was subjected to a hostile workplace

environment because he was "not complaining merely about sporadic and isolated events, but rather about his daily working conditions." Consequently, it vacated the district court's grant of summary judgment against the plaintiff's ADEA claim. In so doing, the Court also relayed:

> While the standard for establishing a hostile work environment is high, we have repeatedly cautioned against setting the bar too high, noting that while a mild, isolated incident does not make a work environment hostile, *the test is whether the harassment is of such quantity or quality that a reasonable employee would find the conditions of her employment altered for the worst.*

*Id.* at 148 (internal marks omitted) (emphasis added) (citing *Whidbee v. Garzarelli,* 223 F.3d at 70; *Torres v. Pisano*, 116 F.3d 625, 632 (2d Cir. 1997)).

On similar reasoning, the evidence and Plaintiff's testimony cements the Court's finding that the environment, while perhaps not severe, was pervasively hostile—much more so than Plaintiff was ever used to. It suffices as being of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse. Therefore, after assessing the totality of circumstances, and viewing the evidence in the light most favorable to Plaintiff, the Court finds that it a trier-of-fact could conclude that the aggregated conditions transformed Mr. Walsh's work environment into a hostile work environment.

### B.  Constructive Discharge

Defendants claim that the evidence adduced through discovery falls woefully short of establishing a constructive discharge. They argue that: 1) the existence of a grievance procedure defeats the claim for constructive discharge and 2) the alleged working conditions were not objectively intolerable. (Def. Mem. at 14.) The Court addresses each.

### 1.  Viability of Grievance Procedure

Beginning with the relevance of the union grievance procedure as it relates to Plaintiff's constructive discharge claim. The Court finds that just because some courts have found that the

presence of alternatives to resignation – such as complaint procedures – *can* preclude a finding of constructive discharge, does not mean they *must*. Certainly, courts have found that when there were alternative dispute resolution channels that the plaintiffs did not avail *at all*, it did not make sense to find that employees were "forced" to resign. *See e.g. Silverman v. City of New York*, 216 F. Supp. 2d 108, 115-16 (E.D.N.Y. 2002), *aff'd*, 64 F. App'x 799 (2d Cir. 2003) (collecting cases). But all those cases were premised on the notion that a plaintiff cannot argue that their resignation was "compelled" when they simply neglected to use viable forms of self-help. *See Simmons-Grant v. Quinn Emanuel Urquhart & Sullivan, LLP*, 915 F. Supp. 2d 498 (S.D.N.Y. 2013) (holding that an employee who "*fails to explore alternative avenues* offered by [his] employer *before* concluding that resignation is the only option cannot make out a claim of constructive discharge.") (emphasis added).

It belies logic to hold that the mere existence of *unviable* forms of dispute resolution preclude the possibility of constructive discharge. Here, the record does not reflect that Plaintiff ignored the grievance procedure, but rather that he attempted to speak with his Union Representative and did not receive any support. (*See* Weber Dep. at 103) ("Steve was complaining that he was being unduly supervised. And that he went to his union and they did not support him. And he was coming to talk to me about the situation."); (*id*. at 120) (reflecting that Ms. Weber's notes stated: "Union will not support him" and "David [the Union President] dismissed him.") It also reflects that Scarsdale's then Assistant Superintendent for Human Resources, Dr. Weber, failed to investigate Plaintiff's complaints or assist him in any meaningful way. (*See* Weber Dep. at 125-26) (discussing how despite that fact that "a tenured faculty member is expressing these concerns, that he thinks there's a hostile work environment, [and that with regards to the full review] there's been no feedback" she did nothing to investigate the claims other than at best

having an undocumented conversation with McDermott).

The record does not even reflect that the grievance procedure was truly tenable. (*See* Walsh Dep. at 69-73) (reflecting that when Plaintiff discussed the viability of filing a grievance with his union, the union told him that he should "put [his] head down and bear whatever was going to come [his] way," which led him to believe that he "probably would not get the audience with the school board that is necessary for a grievance."). There is even some evidence indicating that the union never used it. (*See* Pullen Dep. Ex. 7at 55:12-23, ECF No. 35) ("I met with the union representative several times. She was also brought in to have a meeting with Mike McDermott and I during the full review or before the full review. I don't remember at this point. We were basic— I was basically told that Scarsdale has never had a grievance.") SUFD has certainly not shown any evidence that it has ever been used in the past in similar contexts. Hence, Plaintiff's constructive discharge claim cannot be dismissed on the questionably useful procedure laid out in his CBA.

### 2. Objectively Intolerable Work Conditions

Turning to the objective conditions. First, the Court reiterates that "constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an *intolerable* work atmosphere that *forces* an employee to quit involuntarily." *Silverman*, 216 F. Supp. at 115 (emphasis added) (quoting *Flaherty*, 235 F.3d at 138). The Second Circuit has repeatedly explained that "working conditions are intolerable when, viewed as a whole, they are 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Terry v. Ashcroft*, 336 F.3d at 152 (quoting *Chertkova v. Connecticut General Life Ins. Co.*, 92 F.3d 81 (2d Cir. 1996)). Moreover, it has explained that "[b]ecause a reasonable person encounters life's circumstances cumulatively and not individually," the various conditions are to be treated in an "additive" manner, rather than

"individually." *Chertkova,* 92 F.3d at 90. In sum, the court's goal is to ascertain whether, viewed as a whole, the facts in the case at hand could permit a fact-finder o conclude that the employee was forced to resign. *Id.*

The court finds that Plaintiff has presented sufficient evidence to allow a reasonable fact-finder to conclude that a reasonable person in Plaintiff's position would have felt compelled to terminate his employment. First, as discussed previously, Plaintiff made a sufficient showing for a reasonable trier-of-fact to find that Plaintiff was experiencing a hostile work environment, which involved pervasive harassment by his supervisors in the form of repeated, seemingly arbitrary performance reviews and day-to-day isolation. Second, Plaintiff testified that Dr. Van Dam – during both full review periods – had meetings with Plaintiff in which she encouraged him to consider retirement. This was corroborated by Caran Pullen, Plaintiff's peer who was also in his age bracket and underwent a similar full review, and who also testified that she was urged to retire by McDermott himself, who stated that he would lessen the pressure in the environment if she gave him her written notice. Third, Plaintiff's sudden reassignment to a new house after teaching for 19 years in a different house also supports his claim, just as reassignment of office was considered a relevant factor for the plaintiff's claim in *Terry v. Ashcroft.* Fourth, Plaintiff's feelings of social isolation, embarrassment, and mockery are relevant to his assessment of the hostile environment, as it was important to the Court assessing the cumulative affect of minor slights in *Flowers v. N. Middlesex YMCA*, 2016 WL 1048751, at *8. Fifth, a fact-finder could find that Plaintiff's lack of support from his union, coupled with that of his own administration, left him with no avenues to traverse other than to continue suffering the indignities bestowed on him.

Again, the Second Circuit takes a realistic and wholistic view of the change in the environment to assess whether a reasonable trier-of-fact could deduce that the environment was

hostile enough to compel a reasonable person to feel forced to resign. *Chertkova*, 92 F.3d 81. And in so doing, courts may focus on whether the hostility in the atmosphere was *either* so severe *or* so pervasive as to alter the working conditions of a reasonable employee. *Terry*, 336 F.3d at 149.

Here, Plaintiff has met the test. Though the individual factors may not have been egregious or severe, they had an aroma of hostility and their unprecedented frequency and seeming arbitrariness could certainly allow a reasonable fact-finder to deduce that Plaintiff had no alternatives left but to resign.

### C. Inference of Discrimination

In addition to an objectively intolerable environment, to state a *prima facie* case of constructive discharge, Plaintiff must establish that the constructive discharge "occurred in circumstances giving rise to an inference of discrimination on the basis of [his] membership in [a protected] class." *Terry*, 336 F.3d at 152 (citing *Chertkova*, 92 F.3d at 89). Proof a such a causal connection can be established directly, though evidence of retaliatory animus directed against a plaintiff, or indirectly, by showing that the protected activity was followed closely by discriminatory treatment through other evidence such a disparate treatment of fellow employees who engaged in similar conduct. *Id*. (citations and internal quotation marks omitted).

Because a constructive discharge claim is a flavor of the *prima facie* age discrimination claim, the additional requirement for constructive discharge is the same that Plaintiff would need if he were pleading a run of the mill *prima facie* case—that the employer had discriminatory intent. This element is Plaintiff's remaining element for Plaintiff to demonstrate both his *prima facie* discrimination and constructive discharge claim.

The Court finds that plaintiff has adduced enough evidence to allow a fact finder to conclude that the constructive discharge occurred under circumstances giving rise to an inference

of discrimination on the basis of his age. The same evidence would also allow a fact-finder to conclude that Defendants proffered legitimate reasons for terminating Plaintiff were pretext for an age-related animus.

First, there is a dispute of fact regarding McDermott's characterization of the math testing incident that resulted in Plaintiff's negative performance review. McDermott wrote a report summarizing what he believed happened in this incident based on sources that Plaintiff claims did not have firsthand knowledge. Indeed, everything McDermott memorialized about the incident and Plaintiff's alleged tone is based on hearsay – specifically statements he was told by Ms. Campbell and Ms. Foray. (*See* McDermott Dep. 54:5-14.) At least three individuals who could be deemed eyewitnesses, including Plaintiff, still have conflicting accounts about the incident. (*Compare* Walsh Dep. 93-95, Ex. 3, ECF No. 35 *with* Pincus Dep., Ex. M at 17-38, ECF No. 31 and Overbay Dep. at 17-34, Ex. N, ECF No. 31.) Some of these reflect that Plaintiff was very angry, and others that he was not even in earshot of students. Mr. Goodman, the proctor of the exam and Mr. Pincus, who passed Plaintiff in the hallway when he allegedly used the profanity, refused to give McDermott written accounts of the incident.

Second, Plaintiff evinces that he was repeatedly pressured to retire during his full review processes, something that he showed his colleague was experiencing as well. For example, during his first review, he stated that when he met Dr. Van Dam, she told him that he was doing fine and did not need to change anything with his teaching, but that he should consider retiring. A similar occurrence occurred during his second review. (*See* Walsh Dep., Ex. 3, 134:7-19) ("In my sessions with Dr. Van Dam, because I had a follow-up session with her into the new year. And in that meeting she visited the idea that the stress and your age, et. cetera, that I should strongly consider retiring. And that it might be in the best interest of myself and my family. She counseled me that

I should keep an open mind to that possibility… I was a little surprised because she revisited that topic during that session two or three times, emphasizing that it was something I should keep out in front of me.")

Third, there is evidence that other older teachers were subjected to a similar review process in order to urge them to retire, which they then did. For example, Pullen testified that she, too, felt that she was unnecessarily put on full review status and subjected to heightened supervision and incessant criticism that was unjustified. (Pullen Dep. 146:15-2.) She also described feeling socially isolated whilst she was on full review. (*Id.* at 64.) She similarly described how the teacher's union and Joan Weber, the Assistant Superintendent of Human Resources, were useless in helping her find a solution. (*Id.* at 56.) She also described how McDermott urged her to retire during the full review process. (*Id.* at 117) ("I've been talking about this with Joan. If you put it in writing and agree to retire in a year or two, I will lessen the pressure.") And she, too, described how everyone who went through full review then retired. ("Q: So with the people who you observed, obviously with the exception of Mr. Flisser, who were teaching and you observed go through the same thing that you went through, they all retired, correct? A: Absolutely.") (*Id.* 146:3-8.)

Fourth, there is evidence that other younger teachers who exhibited similar belligerence were not similarly disciplined. For example, multiple parties testified about another professor, Mr. Goodman, who was much younger than Plaintiff, and who on two separate occasions, in front of other faculty members lost his temper and yelled at another faculty member. Ms. Ciccone testified that she witnessed Mr. Goodman yelled at a professor named Mr. Fisher at least once during a faculty meeting. (Ciccone Dep, Ex. 6, 15:8-11, ECF No. 35) ("Mr. Goodman got increasingly agitated to the point that he sat on the edge of his seat and raised his voice, pointed his finger directly in Mr. Fisher's face.") And another was when he got angry at Ms. Ciccone in front of

numerous faculty and students during a fire drill and humiliated her and berated her. (*See id*. 17:9-25-181-24) (describing how Goodman lost his temper, continuously yelled at Ms. Ciccone, telling her things like "You don't need to talk to them" "I've got it under control" "I'm going to tell you this. Nobody yells at me except my father and you're not my father.") McDermott even testified that he learnt about these incidents, yet never met with Goodman, nor disciplined him. (*See* McDermott Dep. at 129.) In sum, Plaintiff has adduced ample evidence to allow a fact-finder to draw an inference of age-related discriminatory intent.

As to pretext, Plaintiff has shown that there is an unresolved question about the purpose of the copious reviews. McDermott himself testified that the purpose of the reviews was "to improve whatever deficits, issues et. cetera have resulted in a need for full review," and he added that it was not "punitive," but employed to make improvements on the issues that necessitated full review. (McDermott Dep. 38:8-25.) And yet there's a problem. When rubber met the road, both in Plaintiff's case and for other older teachers, SUFD provided absolutely no feedback, nor any methods for improvement. (*See* Pullen Dep. 142:4-7) ("Q: Earlier when you had your thirty-two reviews, did you get regular feedback and oversight with respect to those reviews? A: No.") This diminishes the reliability of McDermott's "legitimate" action and bolsters Plaintiff's argument that the entire review process was a pretext to build a sham disciplinary record.

Accordingly, Defendants Motion for Summary Judgment on Plaintiff's constructive discharge/ *prima facie* discrimination claim is DENIED.

## CONCLUSION

For the reasons discussed, Defendants' Motion for Summary Judgment is DENIED in its entirety. The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 30. The parties are instructed to appear before me on April 11, 2019 at 11:00 am for a pre-trial conference.

Dated:   March 22, 2019  
         White Plains, New York

SO ORDERED:

_____  
NELSON S. ROMÁN  
United States District Judge